May 29, 2026

Nicole Solas                    :

v.                              :

South Kingstown School Committee.    :


NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Nicole Solas                          :

v.                                    :

South Kingstown School Committee.    :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Lynch Prata, for the Court.** The plaintiff, Nicole Solas, appeals from a Superior Court entry of judgment in favor of the defendant, the South Kingstown School Committee. This case comes before the Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. The issue presented on appeal is whether the Black, Indigenous, People of Color (BIPOC) Advisory Board is a "public body" subject to the Open Meetings Act (OMA), G.L. 1956 § 42-46-3. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## Facts and Travel

On June 23, 2020, Robin Wildman, executive director of Nonviolent Schools Rhode Island (NSRI), gave a presentation to the South Kingstown School Committee (the school committee) on the mission of NSRI and how the organization could help improve the "climate and culture" of the South Kingstown school district. On July 22, 2020, the school committee unanimously voted to create the "equity and anti racist advisory board" which later became known as the BIPOC Advisory Board (the Board) facilitated by Wildman and Jonathan Lewis, a training director at NSRI. The school committee authorized Wildman and Lewis to facilitate Board meetings in response to numerous community members expressing their concerns about the lack of diversity in district staff members and racial inequity in the district's student disciplinary policies. Community members also shared that students were experiencing acts of racism to such a degree that the school district should implement anti-racist professional development training and provide conflict-resolution training to promote a more equitable school district.

On October 27, 2020, the school committee unanimously voted to continue the Board and executed an agreement with NSRI to facilitate twenty-five meetings

from February through August 2021. Thereafter, the school committee allotted $5,000 of its funds to the Board to facilitate these meetings.[1]

In May 2021, plaintiff learned of the Board's existence and asked the superintendent of the school district, Linda Savastano, for permission to attend its meetings. Savastano directed plaintiff to Wildman, who informed plaintiff that the school district hired the NSRI as a private vendor and that at that time, the Board's meetings were not open the public.[2]

Subsequently, plaintiff filed an administrative complaint with the Rhode Island Office of the Attorney General under § 42-46-8(a) against the BIPOC Board, alleging that the Board was a public body that did not hold open meetings, in violation of the OMA.[3] The school committee filed a response denying plaintiff's

---

[1] The record reveals that NSRI was paid $7,474 for the July 1, 2020, through June 30, 2021, fiscal year. This amount included $5,000 for the facilitation of twenty-five Board meetings and other services performed by NSRI unrelated to facilitation of the Board.

[2] Wildman testified at her deposition that, in the preliminary stage of the Board's formation, participation on the Board was open only to members of the community who identified as BIPOC. This effort was intended to facilitate a safe space for members to share personal stories about how the school district's policies affected them. Wildman also testified that after the preliminary stage, membership on the Board would be open to the larger community. Wildman testified, however, that she rejected Solas's requests to attend the meetings because of Solas's persistent emails and social media remarks to Wildman demanding that the meetings be open to the public and requesting names of individual Board members.

[3] General Laws 1956 § 42-46-8 provides a remedial cause of action for citizens or entities of the state who are aggrieved as a result of a public body operating in violation of the OMA.

allegations. The school committee declared that the Board's mission was "to advocate for equity in the education of students who identify as [BIPOC] in South Kingstown schools, inspiring a healthier and just community and school system for everyone." Additionally, the Board was to "review[] current [s]chool [c]ommittee policies through the lens of inclusivity and equity. If the Board finds facts to lead it to believe that the policy being reviewed does not meet these goals, they bring those concerns to the School Committee Policy Sub-Committee." The School Committee Policy Sub-Committee (the policy sub-committee) would then meet to discuss and vote on the Board's policy proposals and submit said proposals to the school committee for further review.

On May 10, 2022, the Attorney General notified plaintiff that the Board was not a public body under the OMA. Consequently, plaintiff filed a complaint in Superior Court pursuant to the OMA against the school committee. Thereafter, plaintiff filed an amended complaint and moved for summary judgment, arguing that the plain language of the OMA and this Court's holding in *Solas v. Emergency Hiring Council of the State*, 774 A.2d 820 (R.I. 2001), required that the Board be subject to the OMA because, according to plaintiff, the Board possessed advisory power over matters of significant public interest. The plaintiff sought declaratory relief that any actions taken by the Board be deemed null and void. The school committee responded with a cross-motion for summary judgment, arguing that the

- 4 -

Board was not a public body under the OMA, citing to this Court's holding in *Pontarelli v. Rhode Island Board Council on Elementary and Secondary Education*, 151 A.3d 301 (R.I. 2016).

The hearing justice concluded that the school committee "did not evade its own bylaws or state laws," because the Board "[did] not possess any voting or veto power to override the [s]chool [c]ommittee's or the [p]olicy [s]ubcommittee's decision[s] * * *." The hearing justice reasoned that there was a structured process where the Board provided suggestions to the policy sub-committee for its review, which was then subject to further review by the school committee. The hearing justice determined that this framework "provide[d] the public two opportunities to stay informed and voice concerns about the Board's policy proposals * * *." Furthermore, the hearing justice found that, because there was a review process where recommendations or suggestions made by the Board to the policy sub-committee were not "blanketly adopted" by the school committee, "the Board [wa]s analogous to the [Compensation Review Committee] in *Pontarelli*." *See Pontarelli*, 151 A.3d at 308. Accordingly, the hearing justice denied plaintiff's motion for summary judgment, and granted defendant's cross-motion. Final judgment in favor of defendant entered on October 23, 2024. The plaintiff filed a timely notice of appeal.

- 5 -

**Standard of Review**

"This Court reviews a decision granting a party's motion for summary judgment *de novo*." *Citizens Bank, N.A. v. Palermo*, 247 A.3d 131, 133 (R.I. 2021) (quoting *Boudreau v. Automatic Temperature Controls, Inc.*, 212 A.3d 594, 598 (R.I. 2019)). "We assess the matter 'from the vantage point of the trial justice, viewing the evidence in the light most favorable to the nonmoving party, and if we conclude that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law, we will affirm.'" *Felkner v. Rhode Island College*, 291 A.3d 1001, 1008 (R.I. 2023) (brackets and deletions omitted) (quoting *Citizens Bank, N.A.*, 247 A.3d at 133).

Additionally, "[a] Superior Court decision granting or denying declaratory relief is reviewed with great deference by this Court." *LMG Rhode Island Holdings, Inc. v. Office of McKee*, 335 A.3d 444, 448 (R.I. 2025) (quoting *Estrella v. Janney Montgomery Scott LLC*, 296 A.3d 97, 106 (R.I. 2023)). "When deciding an action for declaratory judgment, a Superior Court justice makes all findings of fact without a jury." *Id.* (quoting *Estrella*, 296 A.3d at 106). "Such factual findings are afforded great weight by this Court, and will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." *Id.* (quoting *Estrella*, 296 A.3d at 106). Nevertheless, "a trial justice's findings on 'questions of law and statutory interpretation are reviewed *de novo* by

this Court.'" *Id.* (quoting *Westconnaug Recovery Company, LLC v. U.S. Bank National Association as Trustee for ARMT 2007-2*, 290 A.3d 364, 366 (R.I. 2023)).

**Discussion**

On appeal, plaintiff maintains that the Board is a public body, and thus its meetings are mandated to be open to the public. The plaintiff argues that *Solas* is controlling law because, according to plaintiff, the Board "meets all the criteria this Court has set to determine whether an entity is a 'public body' under the OMA." The plaintiff contends that the Board is comparable to the Emergency Hiring Council (EHC) in *Solas*. *See Solas*, 774 A.2d at 825. The plaintiff alleges that the Board was created by the South Kingstown School Committee specifically to exercise "advisory power," which included making policy decisions on matters of significant public interest. The plaintiff cites to this Court's holding in *Solas* to assert that an entity's exercise of advisory power is sufficient to invoke the OMA and subject the entity to its regulations.

In response, defendant argues that the Board is not a public body subject to the OMA. The defendant contends that this Court's holding in *Pontarelli* controls because the Board operates as an "informal ad hoc working group," distinguishable from the EHC in *Solas*. The defendant avers that the Board is more akin to the Compensation Review Committee (CRC) in *Pontarelli*. *See Pontarelli*, 151 A.3d at 301. The defendant asserts that, under the OMA, a public body must convene to

discuss a matter over which the body has advisory power; defendant alleges that the Board does not have such power. The defendant points to the hearing justice's finding that although the Board submitted proposals to the policy sub-committee, the Board "did not possess veto or voting power to override" any of the policy sub-committee or the school committee's decisions. Likewise, that "any recommendation or suggestion made by the Board to the Policy Subcommittee [was] never blanketly adopted by the School Committee."

The defendant further argues that for the Board to be properly subjected to the regulations of the OMA, the Board must be a public body and its meetings must have a quorum. Thus, according to defendant, the irregularity of the Board's meetings and membership combined with the *ad hoc* nature of the Board's existence fail to establish that the OMA is properly invoked.

Accordingly, the issue presented to this Court is whether the Board is a public body within the meaning of the OMA, such that its meetings must be open to the public pursuant to § 42-46-3. We answer this question in the negative.

This Court has stated that "[w]hen a municipality's actions are challenged as being violative of the Open Meetings Act, we are presented with 'a mixed question of law and fact.'" *Anolik v. Zoning Board of Review of City of Newport*, 64 A.3d 1171, 1174 (R.I. 2013) (quoting *Tanner v. Town Council of Town of East Greenwich*, 880 A.2d 784, 791 (R.I. 2005)). Accordingly, our examination of whether the

Board's meetings "violated the Open Meetings Act will be carried out in a *de novo* manner with respect to the 'application of the law to the facts.'" *Id.* at 1174 (quoting *Tanner*, 880 A.2d at 791).

Additionally, "[i]n matters of statutory interpretation our ultimate goal is to give effect to the purpose of the act as intended by the Legislature." *LMG Rhode Island Holdings, Inc.*, 335 A.3d at 449 (quoting *Sosa v. City of Woonsocket*, 297 A.3d 120, 124 (R.I. 2023)). Therefore, "when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Id.* (quoting *Sosa*, 297 A.3d at 124). Accordingly, "[w]hen interpreting a statute, this Court's task is to 'determine and effectuate the General Assembly's intent and attribute to the enactment the meaning most consistent with its policies or obvious purposes.'" *Cullen v. Lincoln Town Council*, 960 A.2d 246, 249 (R.I. 2008) (brackets omitted) (quoting *Tanner*, 880 A.2d at 796); *see In re J.T.*, 252 A.3d 1276, 1280 (R.I. 2021).

The General Assembly enacted the Open Meetings Act "to ensure that 'public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy.'" *Cullen*, 960 A.2d at 249 (quoting § 42-46-1). To effectuate its purpose, the act requires that "[e]very meeting of all public bodies shall be open to the public unless closed pursuant to §§ 42-46-4

- 9 -

and 42-46-5." Section 42-46-3. Under the OMA, a public body is defined as "any department, agency, commission, committee, board, council, bureau, or authority, or any subdivision thereof, of state or municipal government * * * that funded at least twenty-five percent (25%) of its operational budget in the prior budget year with public funds * * *." Section 42-46-2(5). Further, a meeting is "the convening of a public body to discuss and/or act upon a matter over which the public body has supervision, control, jurisdiction, or *advisory power*." Section 42-46-2(1) (emphasis added).

Indeed, this Court has established that "[a] literal reading of the act demonstrates that all meetings to discuss or act upon matters over which the council has supervision, control, or advisory power, are required to be open to the public." *Solas*, 774 A.2d at 825. Likewise, in *Solas*, this Court stated that "[w]hether supervisory or advisory, both functions are regulated by the act. As the plain language of the statute provides, a council's exercise of advisory power is enough to bring it under the act's umbrella." *Id.*

In *Solas*, the plaintiff requested to attend a meeting held by the EHC to "consider the hiring of a hearing officer for the State Building Commission * * *."[4] *Solas*, 774 A.2d at 821. The EHC informed the plaintiff that he could not attend

---

[4] We note that the plaintiff in *Solas* is not the same plaintiff in this case. *See Solas v. Emergency Hiring Council of the State*, 774 A.2d 820, 821 (R.I. 2001).

- 10 -

because the meeting was closed to the public. *Id.* Subsequently, the plaintiff filed a complaint in Superior Court seeking a declaration that the EHC was subject to and governed by the OMA. *Id.* at 821-22. In rendering our decision, this Court contemplated four primary considerations: (1) the EHC's creation; (2) the consistency of the EHC's meetings; (3) the composition and selection of EHC members; and (4) the EHC's "advisory capacity with veto power over a subject of significant public interest." *Id.* at 823-24.

First, the Court noted that the EHC was created by executive order "to manage and control the state's hiring practices and its fiscal resources." *Solas*, 774 A.2d at 823. Under the Governor's instruction, "no new positions, vacant positions, or promotions could be created or filled without authorization from the EHC." *Id.* Second, we considered that members of the EHC were "required to meet at least biweekly[,]" demonstrating consistent and regularly scheduled meetings. *Id.* at 824. Third, we noted that the EHC was "composed of a group of high level state officials[5] that convene[d] to discuss and/or act upon matters of great interest to the citizens of this state" (i.e., hiring state employees). *Id.* at 825. The EHC's membership of high-level public officials who received their positions by

---

[5] Members of the EHC included "the director of the Department of Administration or a designee, a department director appointed by the Governor * * *, the governor's executive counsel or a designee, the governor's cabinet secretary, and the special assistant to the chief of staff for boards and commissions." *Solas*, 774 A.2d at 824.

appointment reinforced that the EHC was a public body. *See id.* Lastly, the Court concluded that, because the EHC "possesse[d] significant supervisory and executive veto power over creating or filling state employment positions[,] * * * [a]t the very least the [EHC] function[ed] in an advisory capacity in state hirings." *Id.*

By contrast, in *Pontarelli*, a plaintiff, employed as a hearing officer for the Rhode Island Department of Elementary and Secondary Education (RIDE), alleged that the RIDE and the Rhode Island Board Council on Elementary and Secondary Education (the council) violated the OMA when they failed to provide the public with adequate notice of CRC meetings, as required by the act. *Pontarelli*, 151 A.3d at 302. This Court held that the CRC was not a "'public body' and, consequently, [was] not subject to (nor was it in violation of) the OMA." *Id.* at 308.

In analyzing many of the same factors contemplated in *Solas*, this Court reasoned that, "[u]nlike the EHC in *Solas*, the CRC in this case d[id] not meet on a regular basis, nor was the CRC created by an executive order." *Pontarelli*, 151 A.3d at 308; *see Solas*, 774 A.2d at 824. Rather, the CRC was created by the council "to review requested and proposed salary adjustments for RIDE employees." *Pontarelli*, 151 A.3d at 302-03. Likewise, "the CRC d[id] not have regular meetings; rather, it schedule[d] meetings when a CRC member request[ed] one." *Id.* at 303.

Additionally, although this Court recognized that "the CRC was composed of a group of high-level state officials[6] and operated under a charter," we ultimately determined that "these two factors alone [were] insufficient to place [the CRC] into the 'public body' umbrella." *Pontarelli*, 151 A.3d at 308. There, this Court noted that CRC membership was not established by appointment, "instead, serving on the CRC [was] just an additional task for people that [were] on the leadership team." *Id.* at 303 (internal quotation marks omitted). Although the CRC operated under a charter, this Court determined that this factor was not sufficient to invoke the OMA. *Pontarelli*, 151 A.3d at 308. Likewise, the CRC neither took nor kept written meeting minutes. *Id.* at 303.

Notably, in *Pontarelli*, this Court pointed out that in *Solas* "the EHC's advisory power over the matter to be discussed at a meeting alone required that the meeting be open to the public." *Pontarelli*, 151 A.3d at 308. Conversely, we determined that the CRC did not have such advisory power. *Id.* The CRC received salary compensation recommendations from RIDE division chiefs, which the CRC then submitted to the commissioner of RIDE. *Id.* at 303. It was then in the commissioner's discretion to present any of the CRC's recommendations to the

---

[6] "The CRC [wa]s composed of six RIDE employees: three division chiefs, the chief of staff, the human resources coordinator, and the deputy commissioner." *Pontarelli v. Rhode Island Board Council on Elementary and Secondary Education*, 151 A.3d 301, 303 (R.I. 2016).

council. *Id.* at 308. The Court reasoned that, because any recommendations made by the CRC were subject to a review process, "the public would have [had] an opportunity to be informed of and object to such proposal[s]." *Id.*

In the instant case, we conclude that the Board is an amorphous, *ad hoc* group that is more akin to the CRC in *Pontarelli*; it is not a "public body" subject to the OMA. *See Pontarelli*, 151 A.3d at 308; *see also* § 42-46-3. The Board was not a subdivision of local government, but a sporadic group of volunteers created by the South Kingstown School Committee. *See Pontarelli*, 151 A.3d at 302 (stating that the CRC was created by the council); *see also Solas*, 774 A.2d at 823 (noting that the EHC was created by the governor through an executive order). The school committee contracted with NSRI to permit Wildman and Lewis to facilitate meetings for members of the BIPOC community to discuss their personal experiences with and concerns about inequity in the school district. It is evident that any rules pertaining to the Board were created by the NSRI under its contract with the school committee. Similarly, the Board did not operate under a charter or bylaws; the NSRI and Board members made meeting agendas informally.

Additionally, the relaxed nature of the Board's membership and meetings evidence that it served as more of an advocacy or affinity group than a board with "advisory capacity." *Contra Solas*, 774 A.2d at 825. Board members were merely volunteers from the community. They did not receive compensation, medical, or

- 14 -

any other benefits, for their service on the Board. As the hearing justice iterated, the school committee allocated funds to pay NSRI for its facilitation of Board meetings; the funds were not used to compensate members for their participation. Moreover, in her deposition, Wildman testified that she gathered people to attend the meetings by "word of mouth." Unlike the EHC in *Solas*, Board members were not appointed by a subdivision of state or municipal government or elected by the public. *See id.* at 824 (noting the "senior executive branch staff members" on the EHC). The record shows that, in essence, initially anyone who identified as a member of the BIPOC community and, later, the broader community, was welcome to attend the meetings to participate on the Board.

It is clear from the record that the nature of the Board's membership was voluntary and that the Board did not have consistent membership. The record also reveals that meetings occurred weekly for a period but that over time membership reduced and was informal. Wildman attested that the Board's membership started with about fifteen members and that "[d]ue to the personal nature of the stories that were shared, over time, the members began to call each other family." After which, the group's attendance declined to seven or eight regular members. Similarly, an active member of the Board, Mwangi Gitahi, testified that the Board "didn't really have a membership, like, the same number of people who would attend each meeting. It just kind of depended on who was available and who could make it."

Indeed, the inconsistency of the Board's membership leads us to conclude that the Board could not meet a quorum requirement if its membership was indeterminable. *See* § 42-46-2(6).

The plaintiff alleges that the Board possessed advisory power over matters of significant public interest to the citizens of this state. We disagree. The school committee specifically charged Wildman and Lewis with facilitating meetings for members of the BIPOC community to "inspir[e] a healthier and just community and school system for everyone." Naturally, this directive permitted the Board to review specific school policies and provide feedback to the policy sub-committee on how those policies could be amended to influence a more progressive and inclusive school district, but the Board itself had no ability to implement changes to school policies.

Here, the proposal review system, like the CRC's in *Pontarelli*, was a dual-step procedure. *See Pontarelli*, 151 A.3d at 308. The Board would submit policy suggestions, notably on anti-racist, anti-discrimination, and anti-harassment policies to the policy sub-committee, to address issues that Board members and the relevant community were facing in the school district. The policy sub-committee would then either send the suggestions back to the Board for reconsideration or offer the ideas to the school committee for further review. *See Pontarelli*, 151 A.3d at 308 ("[T]he CRC's sole function [was] to advise the commissioner of RIDE, who in turn

- 16 -

has to make a recommendation to the council."). The policy sub-committee was not obligated to accept the Board's suggestions in whole or in part. The policy sub-committee's decision whether to forward the Board's suggestions to the school committee was entirely discretionary. Furthermore, both the policy sub-committee and the school committee were public bodies subject to the OMA, and held open meetings. *See* § 42-46-3. Accordingly, interested district members had an opportunity to stay informed about the district's policy determinations at both stages of the process. *See Pontarelli*, 151 A.3d at 308 ("[I]f the commissioner decided to present any proposal to the council for the council's required approval, the public would have an opportunity to be informed of and object to such proposal.").

The plaintiff contends that the Board possessed "advisory power" because, according to plaintiff, the school committee appointed at least two members of the Board to the policy sub-committee, which did have voting and veto power. *See* § 42-46-2. Based on the record, that assertion is inaccurate. Indeed, the policy sub-committee had voting power on proposals to school policies; however, the school committee did not appoint any members of the Board to the policy sub-committee. The record indicates that, after the Board's creation, the school committee reserved one seat on the policy sub-committee for a Board member. The seat was designated so that a Board member could be present at policy sub-committee meetings to discuss the proposed suggestions. After a successful

petition by the Board, this number was increased to two. Nonetheless, the seats were not established for a particular member of the Board; they were for any Board member who was available and willing to attend the policy sub-committee meeting. *Contra Solas*, 774 A.2d at 824 (noting that the EHC was composed of members appointed by the Governor). Consequently, anyone who volunteered to be a representative occupied the reserved seat. Moreover, no Board members were members of the school committee. Accordingly, the fact that the school committee reserved two spots for Board representation on the policy sub-committee does not advance plaintiff's argument because members of the public had access to the policy sub-committee and the school committee meetings, both of which were open to the public. *See Pontarelli*, 151 A.3d at 308 (stating that council meetings were open to the public when it deliberated salary adjustments proposed by the CRC). Therefore, we discern no error in the hearing justice's determination.

Finally, plaintiff avers that the hearing justice's decision circumvents the policy behind the OMA, which mandates transparency for matters of significant public interest, and permits the school committee to use third-party vendors to evade the statute. The plaintiff contends that *Solas* requires a broad interpretation of § 42-46-1, in favor of meetings being public, and that the hearing justice's interpretation improperly narrows its reach. Section 42-46-1; *see Solas*, 774 A.2d at

825. Indeed, this Court has stated that the statute requires a broad interpretation,[7] however, the Board does not convene on matters over which it has veto power or advisory capacity. *See Solas*, 774 A.2d at 824. The Board was not comprised of public officials who formally convened to make deliberations and decisions on public policy, such that adherence to the statute was required. *Contra id.* ("The EHC combines senior executive branch staff members with employees for assistance with the functions and objectives set forth in both executive orders * * *. It is clear that the council has been granted significant influence and veto power over creating positions in state government * * *.").

It is clear that that the Board was a sporadic, *ad hoc* group of community members who volunteered to meet to share their experiences and make suggestions about how to create a more inclusive school community. Upon receipt of Board suggestions, the policy sub-committee would deliberate and advise the school committee on what, if any, changes might be implemented. Certainly, Solas had the opportunity to attend policy sub-committee and school committee meetings to learn of or object to such changes. Accordingly, the hearing justice was correct in his

[7] "[J]urisdictions have enacted open meeting or 'sunshine' laws for the public interest to protect the public from 'closed door' politics; and, as such, these enactments should be broadly construed and interpreted in the light most favorable to public access to achieve their remedial and protective purpose." *Solas*, 774 A.2d at 824.

determination that the Board is not a public body subject to the open meetings requirement of the OMA.

## Conclusion

For the reasons stated herein, the Superior Court judgment is affirmed. The papers may be remanded thereto.

Justice Goldberg participated in the decision but retired prior to its publication.

## STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Nicole Solas v. South Kingstown School Committee. |
| **Case Number** | No. 2025-6-Appeal.<br>(PC 22-4727) |
| **Date Opinion Filed** | May 29, 2026 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Christopher K. Smith |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Jonathan Riches, Esq.<br>For Defendant:<br><br>Deidre E. Carreno, Esq. |